UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

IN RE: GRAND JURY SUBPOENA,
MATTHEW COLE,
Subpoenaed Party.

UNDER SEAL[1]
CASE NO. 4:26dm1

## REPORT AND RECOMMENDATION

Journalist Matthew Cole filed a Motion to Quash a grand jury subpoena seeking his testimony, (ECF No. 1). Cole argues the subpoena is grossly overbroad, was issued in bad faith, and violates First Amendment protections for reporters like him. Mem. L. Supp. Matthew Cole's Mot. to Quash ("Cole's Mem.") (ECF No. 2, at 3-23). The United States opposes the Motion, arguing that the subpoena lawfully seeks information both relevant and material to its investigation [redacted] without violating First Amendment protections. Gov't's Resp. to Matthew Cole's Mot. to Quash ("Gov't's Opp'n") (ECF No. 8, at 5-20). The matter was referred to me to prepare a Report and Recommendation under 28 U.S.C. §636(b)(3), (ECF No. 5). After review, I find that the subpoena serves a legitimate law enforcement purpose tailored to a specific investigation without infringing any protections Cole is due under the First Amendment. Cole fails to establish that the subpoena

[1] Matthew Cole filed a Motion to Unseal these proceedings, (ECF No. 10). However, at the time of issuing this Report and Recommendation, the Motion is not yet ripe for resolution. Thus, the court will issue a determination regarding Cole's Motion to Unseal at a later date.

was issued in bad faith, or in violation of DOJ policies. Accordingly, for the reasons explained in detail below, I recommend the court DENY the Motion to Quash, (ECF No. 1).

## I. BACKGROUND

### A. Matthew Cole and *The New York Times* Article

Matthew Cole is an investigative journalist who has reported on national security issues with a focus on "America's clandestine wars and undisclosed government programs" for over two decades. Decl. of Matthew Cole ("Cole Decl.") ¶ 1 (ECF No. 2-3, at 1). Relevant here, on September 5, 2025, Cole co-authored an article for *The New York Times* (or "*Times*"), detailing a top-secret SEAL Team 6 mission in 2019 "to plant an electronic device that would let the United States intercept the communications of North Korea's . . . leader . . . amid high-level nuclear talks with President Trump." Dave Philips & Matthew Cole, How A Top Secret SEAL Team 6 Mission Into North Korea Fell Apart, N.Y. TIMES (Sept. 5, 2025), https://www.nytimes.com/2025/09/05/us/navy-seal-north-korea-trump-2019.html [https://perma.cc/AV3X-DNND]. The article notes that the "operation has never been publicly acknowledged, or even hinted at," and that "[t]he details [that] remain classified" were reported for the first time in the *Times* article after the authors collected information from "interviews with two dozen people . . . [who] spoke on the condition of anonymity because of the mission's classified status." Id. Cole supplemented the article

with a Substack[2] post explaining why he chose to publish the article in *The New York Times*. Matthew Cole, NYT Article About the SEAL Team 6 Mission to North Korea, SUBSTACK (Sept. 5, 2025), https://matthewcole.substack.com/p/nyt-article-about-the-seal-team-6 [https://perma.cc/T3C9-TQWK]. He also acknowledged that the mission to North Korea was "one of the most highly classified military missions in a generation" that he learned about through disclosures from a "trusted and vetted source." Id. Because he wanted to avoid exposing his source given the disclosure's circumstances, Cole noted that he waited eight months before contacting other potential sources to corroborate the information. Id.

B. Government Investigative Efforts

Following publication of the *Times* article, three components of the Department of Justice (DOJ)—the Federal Bureau of Investigation (FBI), the National Security Division, and the United States Attorney's Office for the Eastern District of Virginia—began investigating possible violations of statutes criminalizing the unauthorized disclosure of national defense information.[3] Gov't's Opp'n (ECF No. 8, at 4). The Government

[2] Substack is an online publishing platform that allows independent writers, journalists, and other content creators to send content directly to readers for free or based on paid subscriptions. Substack, https://substack.com/about [https://perma.cc/H48E-23VF].

[3] For examples of possible statutes, see 18 U.S.C § 793(d) (ten-year felony for willful unauthorized disclosure of national defense information); 18 U.S.C.

shared that its investigative efforts included [redacted] Id.

On February 6, 2026, around five months after publication of *The New York Times* article, prosecutors in the DOJ National Security Division requested approval from the Attorney General of the United States for the issuance of a grand jury subpoena for Cole's testimony in this matter. Id. The Attorney General granted approval on February 8, 2026, and two FBI agents served Cole on February 9, 2026, with the subpoena to testify before a grand jury in Newport News. Id.

The United States[4] and counsel for Cole then engaged in extensive discussions to reach a resolution without having to enforce the subpoena. [redacted] O'Neil Decl. ¶¶ 3-6 (ECF No. 2-5, at 2-3); Gov't's Opp'n (ECF No. 8, at 5). The United States proposed alternatives to testimony before the grand jury, including a

§ 1924 (five-year felony for unauthorized removal or retention of classified documents).

[4] In these negotiations, the United States was represented by one Assistant United States Attorney for the Eastern District of Virginia and one Trial Attorney for the DOJ National Security Division. Decl. of David A. O'Neil ("O'Neil Decl.") ¶ 3 (ECF No. 2-5, at 2-3).

voluntary interview or an attorney proffer [redacted]. Gov't's Opp'n (ECF No. 8, at 5). The United States' counsel also suggested a willingness to [redacted]. Id. Cole, however, did not want to reveal any information and, after obtaining the Government's agreement that it would not attempt to enforce the subpoena while this matter was pending, he filed the present motion. Id.; Cole's Mem. (ECF No. 2, at 4, n. 6).

**C. Current Motion**

Cole moved to quash the subpoena, (ECF No. 1), arguing that that it is a "broad and indiscriminate demand for disclosure of [redacted] that is tainted with "retaliatory animus," and constitutes prohibited harassment of the press in violation of the First Amendment protections for newsgathering activities. Cole's Mem. (ECF No. 2, at 1, 10-23). Cole contends that the subpoena is not necessary to prove and does not seek information essential to criminal prosecution but rather serves as the United States' attempt to impermissibly annex the news media as part of its investigative first steps. Id. at 13-16. Citing a claimed lack of independent investigation and failure to adhere to DOJ internal policy and procedures, Cole argues that the subpoena should be quashed. Id. at 18-19. He further argues that the deviation in practice underscores the warrant's overbreadth and demonstrates the hostile and retaliatory motives

underlying its issuance. Id. at 18-19. He emphasizes the President and his administration's direct attacks on *The New York Times* as broader context and further evidence of the lack of good faith. Id. at 20-23. Cole extends his First Amendment violation claims beyond speech protections and argues that the subpoena also impermissibly intrudes on associational rights protected under the First Amendment. Id. at 23-25. In addition to the First Amendment, Cole argues the subpoena violates a federal common law reporter's privilege under Rule 501 of the Federal Rules of Evidence that he urges the court to recognize. Id. at 25-29.

The United States opposes the motion, disputing all of Cole's arguments. Gov't's Opp'n (ECF No. 8). First, the Government argues that reporters enjoy no special privilege to avoid grand jury testimony under the First Amendment or federal common law. Id. at 6-9. In this case specifically, the Government argues that the information sought from Cole's testimony is relevant and material to the matter before the grand jury because Cole (among several contributors to the *Times* article) [redacted]. The Government also argues that the subpoena was issued in compliance with DOJ policy and in good faith to determine and charge individuals who have unlawfully disclosed confidential national security information. Id. at 16-20. Any

broader context and "public expressions of anger by government officials directed at other journalists, the *Times*, or about the press generally, do not demonstrate that the subpoena to [Cole] was issued in bad faith" because these other public statements were not directed at Cole specifically. Id. at 19. The Government asks the court to enforce the subpoena requiring Cole to testify before the grand jury. Id.

Cole replied, arguing that the court should not defer to the United States for any presumption of prosecutorial regularity, and should "instead recognize the realities that, in combination with the subpoena's overbreadth and prematurity, render the Government's demand in this case fundamentally inconsistent with the law." Mem. L. Further Supp. Matthew Cole's Mot. to Quash ("Cole's Reply") (ECF No. 9, at 3). Cole further argues that the court need not find a retaliatory motive directed individually at Cole, but rather, the broader context of attacks against the media and *The New York Times* as well as the lack of adherence to typical DOJ protocol are both sufficient to demonstrate impermissible harassment underlying the issuance of the subpoena. Id. at 3-7, 10-17. This Report addresses each of these arguments.

## II. DISCUSSION

Sometimes the law is very clear: "there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation." Branzburg v.

Hayes, 408 U.S. 665, 708 (1972). In the half-century since Branzburg made this plain, the United States Supreme Court has reaffirmed this rule. See, e.g., Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991) ("[T]he First Amendment [does not] relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source."); Univ. of Pa. v. EEOC, 493 U.S. 182, 201(1990) (relying on Branzburg's rationale to reject "the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in confidence without a special showing that the reporter's testimony was necessary"). Without overruling Branzburg, it remains to this day "the duty of a citizen, whether reporter or informer, to respond to [a] grand jury subpoena and answer relevant questions put to him." Branzburg, 408 U.S. at 697. A reporter, like any other citizen, is thus obligated to comply with a valid grand jury subpoena, and enjoys no special privilege to protect the [redacted] See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1148 (D.C. Cir. 2006) (enforcing subpoenas requiring reporters to disclose [redacted], based on Branzburg's "absolute and unreversed answer to the question of constitutional privilege").

Of course, as Cole argues, Branzburg does not foreclose all protections for members of the news media:

> [N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash.

Branzburg, 408 U.S. at 707. This protection—which applies to journalists and non-journalists alike—does not allow a reporter to refrain from testifying before a grand jury in all criminal proceedings. It offers protection in cases of bad faith investigations, and to prohibit governmental harassment. The Fourth Circuit similarly held:

> There is no First Amendment testimonial privilege, absolute or qualified, that protects a reporter from being compelled to testify by the prosecution or the defense in criminal proceedings about criminal conduct that the reporter personally witnessed or participated in, absent a showing of bad faith, harassment, or other such non-legitimate motive, even though the reporter promised confidentiality to his source.

United States v. Sterling, 724 F.3d 482, 492 (4th Cir. 2013); see also In re Shain, 978 F.2d 850, 852 (4th Cir. 1992) ("[A]bsent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution.").

In this case, Cole fails to show that his grand jury subpoena was issued in bad-faith, harassing, or otherwise illegitimate. He does not contest the fact that the Government investigated for five months before issuing the subpoena, engaged in extensive negotiations with Cole's counsel to find alternatives to grand jury testimony, and offered to narrow the scope of the information sought from Cole's testimony. He provides no convincing evidence that the United States intended to harass him by issuing a subpoena or that it failed to comply with DOJ policy and procedures. Additionally, although Cole emphasizes the Government's current fraught relationship with the media, this broader context, standing alone, is insufficient to demonstrate that the particular investigation which resulted in Cole's grand jury subpoena was undertaken in bad faith. Rather, the United States seeks Cole's testimony because it is relevant and material to its specific investigation regarding, what it believes in good faith to be, [redacted] Accordingly, I recommend the court deny Cole's Motion to Quash, (ECF No. 1).

**A. The subpoena, issued in compliance with DOJ policy, is tailored to a specific government inquiry and seeks relevant and material information for the grand jury investigation.**

"[N]ewsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation." <u>Branzburg</u>, 408 U.S. at 685. "[S]o long as the

subpoena is issued in good faith and is based on a legitimate need of law enforcement, the government need not make any special showing to obtain evidence of criminal conduct from a reporter in a criminal proceeding. The reporter must appear and give testimony just as every other citizen must." Sterling, 724 F.3d at 496. The United States has a legitimate law enforcement need for Cole's testimony in this case and did not issue a subpoena in bad faith.

**i) Scope of the Subpoena**

The testimony the United States seeks from Cole is not overbroad. It is tailored to this specific *Times* article and the Government's investigation into the [redacted]. Cole attempts to distinguish Branzburg and Sterling by arguing that the subpoenas in those cases were more narrowly drawn and issued to identify specific, concrete information necessary for "the heart of the prosecution" at the tail-end of government investigations that had already exhausted multiple alternative avenues before issuing subpoenas. Cole's Mem. (ECF No. 2, at 11-13) (citing Sterling, 724 F.3d at 499; Branzburg, 408 U.S. at 667-79). Unlike both those cases, Cole contends that the subpoena here is much broader in scope because [redacted]. Id. at 13, 15. Cole also takes issue with the Government's alleged failure to

follow DOJ policy and perform an extensive investigation to narrow its focus, as allegedly evidenced by the short time between publication of the article and the issuance of the subpoena. Id. at 14, 17. Thus, he argues the subpoena has a "remote and tenuous" relationship to any pending investigation, rather than lying at "the heart of the prosecution," and is a violation of the First Amendment. Id. None of these arguments are supported by the record.

For example, Cole's argument that the Government's investigation has not shown that any conversation with Cole involved criminal conduct or is essential to criminal prosecution, Cole's Mem. (ECF No. 2, at 15); Cole's Reply (ECF No. 9, at 14-15), is belied by his own Substack post—which lays out explicitly for the Government that it was Cole (among various contributors to the *Times* article) who received highly confidential information regarding "a top secret mission so complex and consequential" that "if detected, not only could sink negotiations but also could lead to a hostage crisis or an escalating conflict with a nuclear-armed foe" from a source familiar with the operation. Matthew Cole, NYT Article About the SEAL Team 6 Mission to North Korea, SUBSTACK (Sept. 5, 2025), https://matthewcole.substack.com/p/nyt-article-about-the-seal-team-6 [https://perma.cc/ T3C9-TQWK]. "[I]f what [Cole] wrote was true, he ha[s] direct information to provide the grand jury concerning the commission of serious crimes."

Branzburg, 408 U.S. at 708-09. The Government, thus, legitimately "seeks to compel evidence that [Cole] alone possesses—evidence that goes to the heart of the prosecution." Sterling, 724 F.3d at 499. It appears Cole was the only one of five contributors to the *Times* article to have received a witness subpoena, which followed the Government's nearly five-month inquiry. Cole has not contested those facts nor has he disputed the Government's proffer that it offered to narrow its request or even receive a proffer of testimony in lieu of appearance. At bottom, Cole's overbreadth argument runs headlong into the narrow point of disagreement—on which his Motion is premised—his desire to avoid disclosure [redacted].

But if the court in Branzburg held that reporters had to testify about the illegal activity of hashish dealers, 408 U.S. at 667-69, 692, then obtaining Cole's testimony about individuals who illegally disclosed information about "one of the most highly classified military missions in a generation" is no less a legitimate federal law enforcement interest. See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1165-66 (D.C. Cir. 2006) (Tatel, J., concurring) ("If, as Branzburg concludes, the First Amendment permits compulsion of reporters' testimony about individuals manufacturing drugs or plotting against the government, all information the government could have obtained from an undercover investigation of its own, the case for a

constitutional privilege appears weak indeed with respect to leaks, which in all likelihood will be extremely difficult to prove without the reporter's aid." (citation omitted)).

Cole argues that enforcing this subpoena would allow prosecutors to serve subpoenas on reporters investigating a myriad of topics, "thereby chilling the initiation of investigation reporting on issues of profound public importance." Cole's Mem. (ECF No. 2, at 16). However, Branzburg and Sterling both considered and rejected similar "chilling effect" arguments. Branzburg, 408 U.S. at 698-99 ("We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. . . . From the beginning of our country the press has operated without constitutional protection for press informants and the press has flourished."); Sterling, 724 F.3d at 503 ("We are also mindful that the Court in Branzburg considered and was unpersuaded by a virtually identical argument that a reporter's privilege was necessary to prevent a chilling effect on newsgathering."). Similarly, I find that in the fifty-plus years since Branzburg was decided, "[t]he existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press," and this Report finds no cause to deviate from long-

standing Supreme Court and Fourth Circuit precedent. See Branzburg, 408 U.S. at 698-99.

Cole also argues that First Amendment protections are not limited to circumstances involving bad-faith or harassment, and the subpoena here targets journalistic activity in a sweeping manner with a goal "to end reporting like Mr. Cole's in the national security space by punishing anyone who would provide the necessary information and intimidating any journalist willing to report on it." Cole's Reply (ECF No. 9, at 7-8). To the extent this argument and Cole's resistance to testifying are rooted in the belief that disclosure [redacted] served the public interest and should not be criminalized, he must advocate elsewhere. See, e.g., United States v. Simms, 914 F.3d 229, 251 (4th Cir. 2019) ("Congress alone—not the executive or the judiciary—is equipped to balance competing policy priorities and to define the boundaries of criminal law."). Grand jurors are instructed that they "cannot judge the wisdom of criminal laws enacted by Congress. . . . That is to be determined by Congress and not by [them]." Federal Judicial Center, Grand Jury Selection and Instructions, Benchbook for United States District Courts § 7.04(E), at 342 (7th ed. 2026), https://www.fjc.gov/sites/default/files/materials/04/Benchbook-US-District-Courts-2026.pdf [https://perma.cc/S8KY-AUSB].

**ii) Compliance with DOJ Policy and Procedure**

Contrary to Cole's argument, issuance of the subpoena in this case also complied with DOJ procedures and occurred after prior government investigative efforts. The United States is not free to "'annex' the news media as 'an investigative arm of the government.'" Sterling, 724 F.3d at 497 (quoting Branzburg, 408 U.S. at 709 (Powell, J. concurring)). In line with this, DOJ guidelines outlined in 28 C.F.R. § 50.10 provide that subpoenas for testimony by members of the news media must be approved by the Attorney General and should meet the following standards:

> (a) "In criminal matters, there should be reasonable grounds to believe, based on public information, or information from sources other than the member of the news media who would be the target of the requested compulsory process, that a crime has occurred, and that the information sought is essential to a successful investigation or prosecution. The subpoena or court order should not be used to obtain peripheral, nonessential, or speculative information."
>
> (b) Before issuing the subpoena, "[t]he government should have made all reasonable attempts to obtain the information, communication records, or business records from alternative sources."
>
> (c) "The government should have pursued negotiations with affected member of the news media, unless the Attorney General determines that such negotiations would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm."
>
> (d) "In investigations of unauthorized disclosures of national defense information or of classified information, where the relevant Department or agency head certifies to the Attorney General the significance

> of the harm raised by the unauthorized disclosure and that the information disclosed was properly classified, and reaffirms the Department's or agency's continued support for the investigation and prosecution, the Attorney General may authorize the Department of Justice, in such investigations, to issue subpoenas to members of the news media."
>
> (e) "The proposed subpoena or court order should be narrowly drawn. It should be directed at material and relevant information regarding a limited subject matter, should cover a reasonably limited period of time, should avoid requiring production of a large volume of material, and should give reasonable and timely notice of the demand."

28 C.F.R. § 50.10(c)(1), (4). This internal policy, however, "is not intended to, and does not, create any [legally recognizable] right or benefit" in any person. Id. § 50.10(h)(i).

In this case, Cole argues that the DOJ did not adhere to its internal policy requirements before issuing the subpoena by failing to do the following: (1) cite any reasonable grounds independent from Cole's *Times* article and Substack post to believe a crime has occurred; (2) attempt to obtain information from alternative sources; (3) negotiate with Cole before serving him the Subpoena; and (4) issue a "narrowly drawn" subpoena that is directed at "material and relevant information regarding a limited subject matter" for "a reasonably limited time period." Cole's Mem. (ECF No. 2, at 17). Rather, Cole argues that the subpoena was impermissibly served as the opening volley of the Government's investigation instead of coming at the end of its efforts. Cole believes the Government should have exhausted all other means to

obtain the information sought as required, he claims, by internal DOJ policy and both Branzburg and Sterling. Id. at 14.

Cole, however, does not contest that the United States' investigative efforts began in October 2025. Specifically, shortly after publication of *The New York Times* article, the FBI, DOJ National Security Division, and the United States Attorney's Office for the Eastern District of Virginia all opened investigations into possible criminal violations for unauthorized disclosure of national defense information. Part of those investigative efforts included review of internal government records, numerous voluntary witness interviews, and applications for the issuance of other legal process from this court.[5] The subpoena at issue was approved by the Attorney General of the United States, nearly four months after the start of the Government's investigations and publication of the *Times* article. Branzburg similarly involved challenges made by multiple reporters to grand jury subpoenas issued during the early months of criminal investigations. Branzburg, 408 U.S. at 667-79. The information sought in those situations were key to moving the investigation

[5] Although the United States did not provide an *ex parte* filing in this matter, as correctly noted in Cole's reply brief, (ECF No. 9, at 15-16), its use of other investigative measures requiring legal process to obtain more information regarding this article and the alleged unauthorized disclosure of classified information is a matter of court record. Additionally, the United States is not required to submit an *ex parte* filing detailing all its investigative efforts in order to subpoena a member of the news media. Rather, the line prosecutors need approval from the Attorney General of the United States, which they obtained in this case.

forward, as is the case with Cole's testimony. Without acknowledging these months of investigation, Cole misconstrues the timing of the Government's request for his testimony.

The Government also notes—and Cole again does not contest—that the United States engaged in negotiations with Cole's counsel and discussed the possibility of alternatives to grand jury testimony to obtain relevant information from Cole. Gov't's Opp'n (ECF No. 8, at 5). The negotiations came to an end in April 2026 when Cole's counsel recognized that the Government's objective was [redacted]. Id. Although the Government rescheduled Cole's testimony before the grand jury for June, the Government remained open to other resolutions including "a voluntary interview—or even an attorney proffer—regarding the [redacted]" Id. "In response to Cole's concerns about the breadth of this request, government counsel suggested a willingness to narrow its focus to, among other topics, [redacted]." Id.

While this is not the most detailed disclosure of all of the Government's investigative steps, the court nonetheless finds this description of the procedural posture at the time the Government

served Cole to be sufficient to determine that the United States did not haphazardly issue the grand jury subpoena. Additionally, enough time has passed from the publication of the article and the start of the Government's investigation to the issuance of the subpoena for the court to find that the subpoena was far from the first step in the Government's investigative efforts as Cole claims.

**B. Cole provides no evidence to support his claim of bad faith in the Government's request for this subpoena or his testimony.[6]**

The United States Supreme Court's holding in Branzburg recognized that "news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." 408 U.S. at 707. "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." Id. In situations of bad-faith investigations or harassment of journalists, it would be reasonable for the court to quash a subpoena.

[6] Cole argues that the breadth of the subpoena and the Government's failure to adhere to its own regulation is evidence on its own of a lack of good faith in issuing the subpoena. Cole's Mem. (ECF No. 2, at 19). However, as discussed above, the United States has a legitimate reason to issue this subpoena that was tailored to its specific investigation into leaked classified information and complied with internal DOJ policy and procedures. As such, this portion of the Report addresses the broader context of the current presidential administration's actions described in Cole's briefing, and whether standing alone, they support Cole's bad-faith argument.

In this case, however, Cole's harassment and bad-faith claim is largely, if not entirely, premised on the broader efforts of the current presidential administration to apply pressure on journalists and reporters critical of President Donald Trump. Cole's Mem. (ECF No. 2, at 5-9, 18-23); Cole's Reply (ECF No. 9, at 1-6, 10-14). Cole cites no fewer than thirty examples he describes as the administration's actions targeting the press—including statements made directly by President Trump about *The New York Times*[7]—which he argues reflect the Government's animus and extend to Cole and his reporting. Cole's Mem. (ECF No. 2, at 19-21); Cole's Reply (ECF No. 9, at 12-13). Cole argues that this broader context reinforces the conclusion that the subpoena is "tainted by retaliatory animus and intended, at least in part, to harass Mr. Cole and disrupt his source relationships." Cole's Mem. (ECF No. 2, at 20).

The examples Cole cites are distressing and lamentable. But they do not demonstrate that the subpoena in this case was issued in bad faith. As exhaustively cited, this record includes restrictions on reporters' access to government venues that

[7] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 23, 2025, at 00:32 ET), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010 [https://perma.cc/VT8E-4RQL] ("The Failing New York Times, and their lies and purposeful misrepresentations, is a serious threat to the National Security of our Nation. Their Radical Left, Unhinged Behavior, writing FAKE Articles and Opinions in a never ending way, must be dealt with and stopped. THEY ARE A TRUE ENEMY OF THE PEOPLE!")

typically facilitate communication with the press and the public,[8] changes to government employment contracts to limit discussion with reporters,[9] and other formal changes to federal regulations governing the press. Other judges in this District—in a case modifying a search warrant directed to a reporter—have recognized that the current "administration has attempted to identify federal employees who disclose government information to the press." See In re the Search of Real Prop. & Premises of Hannah Natanson, No. 1:26-sw-00054, 2026 WL 510727 (E.D. Va. Feb. 24, 2026), aff'd sub nom Matter of Search of Natanson, 2026 WL 1458902 (E.D. Va. May 4, 2026).[10] The President has been particularly direct in his attacks on the *Times*, which he has described on social media as "treasonous" and a "true [enemy] of the [p]eople." Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 9, 2025, at 9:11 p.m. ET),

---

[8] Scott Nover, Pentagon Bans Journalists from Press Office, Designating it a Classified Space, WASH. POST (June 1, 2026), https://www.washingtonpost.com/National-security/2026/06/01/pentagon-bans-journalists-press-office-designating-it-classified-space/ [https://perma.cc/M5Y3-NBLQ]; Zach Montague, White House Must Allow the Associated Press Full Access to Trump, Judge Rules, N.Y. TIMES (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/trump-ap-oval-office-access.html [https://perma.cc/FJ25-WPVJ]; Michael Kunzelman, Judge Sides with New York Times in Challenge to Policy Limiting Reporters' Access to Pentagon, ASSOCIATED PRESS (Mar. 20, 2026), https://apnews.com/article/pentagon-policy-news-reporters-hegseth-dc7a69b7e7c3f618b3879d9cafec9b25 [https://perma.cc/VR57-4UMQ].

[9] Andrea Hsu, Tired of Leaks, the Trump Administration Wants Federal Workers to Sign NDAs, NPR (May 27, 2026), https://www.npr.org/2026/05/26/nx-s1-5835300/trump-opm-nda-leaks-federal-employees [https://perma.cc/9X7K-56PY]; Giselle Ruhiyyih Ewing, Hegseth Says Staffers Found Leaking 'Will Be Prosecuted' Amid Pentagon Chaos, POLITICO (Apr. 22, 2025), https://www.politico.com/news/2025/04/22/pete-hegseth-leaks-investigation-00302506 [https://perma.cc/F5LH-DZUD].

[10] Cole heavily relies on this case for his arguments but fails to note that both Judge Porter and Judge Trenga upheld the search warrant at issue, and only modified its scope because it still served a legitimate law enforcement purpose involving concerns of national security.

https://truthsocial.com/@realDonaldTrump/115692843128539904 [https://perma.cc/GF9Y-YCLC].

Perhaps the most explicit of these attempts, and most relevant to the matter here, is President Trump's reported statement that the appropriate first response to publication of confidential government information is to "[g]o to the reporter & ask him/her" to disclose confidential sources, and "[i]f not given the answer, put whoever in jail until the answer is given. You might add the publisher and editor to the list." Andrew Feinberg, Trump Demands Politico Reporter and Editor Be Jailed to Expose Their Supreme Court Dobbs Leak, INDEP. (Jan. 19, 2023) https://www.independent.co.uk/news/world/americas/us-politics/donald-trump-politico-court-leak-abortion-b2265748.html [https://perma.cc/4BCD-82L2]. To reflect the administration's aggressive approach to leaks of confidential information, then-Attorney General Pam Bondi issued a memorandum instructing all DOJ employees that members of the news media "must answer subpoenas," and that "[t]his Justice Department will not tolerate unauthorized disclosures that undermine President Trump's policies, victimize government agencies, and cause harm to the American people." Memorandum from Pamela Bondi, Att'y Gen., U.S. Dep't of Just., to All Dep't Emps., Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media (Apr. 25, 2025), https://www.justice.gov/oip/media/1399681/dl?inline [https://perma.cc/Y4Y7-44BU].

Since then, DOJ has rescinded grand jury subpoenas issued to three *Wall Street Journal* reporters and a *Washington Post* reporter, which were reportedly issued at the personal request of the President, shortly after those news organizations challenged the subpoenas in this District. Alanna Durkin Richer & Eric Tucker, Justice Department Withdraws Subpoenas That Sought Reporters' Grand Jury Testimony, Sources Say, ASSOCIATED PRESS (June 23, 2026), https://apnews.com/article/justice-department-fbi-mediac4fcb4d718d8313940f7c19a8f3f8e26 [https://perma.cc/N2K4-YZWC].[11] Unlike in all these situations, however, the United States has decided to move forward in this matter and maintains—with support in the record—that it followed proper procedure and issued the subpoena in good faith, not out of animus towards Cole.

The extensive record described in Cole's briefing demonstrates that the deterioration in the relationship between the government and the media is a matter of legitimate concern. It has, in some instances given rise to investigative measures directed at identifying confidential journalistic sources without the prior exhaustion of less intrusive investigative avenues or

[11] Cole also cites other instances where the DOJ issued subpoenas to reporters as the first investigative step in leaks of classified information. See, e.g., Hannah Rabinowitz & Kaitlan Collins, Trump Pushed DOJ to Subpoena Reporters over War Leaks, Sources Say, CNN (May 11, 2026), https://www.cnn.com/2026/05/11/politics/trump-doj-subpoenas-iran-war-leaks [https://perma.cc/GUV4-Q8F6]; Michael M. Grynbaum, Times Journalists Subpoenaed as Trump Escalates Pressure on Media, N.Y. TIMES (July 11, 2026), https://www.nytimes.com/2026/07/11/business/media/new-york-times-trump-subpoenas.html [https://perma.cc/WTQ9-GH8M].

adherence to procedural safeguards ordinarily expected from prosecutors. These broader considerations, however, do not arise in the present matter. Cole argues that harassment does not need to be directed individually at Cole by the line prosecutors in this matter. Cole's Reply (ECF No. 9, at 12). But even the concurrence in Branzburg—which Cole heavily relies on to make his argument—notes that determinations of bad-faith to quash a subpoena must be done on a "case-by-case basis." Branzburg v. Hayes, 408 U.S. 665, 710 (1972) (Powell, J., concurring). And this case is not concerned with an attempt to use investigative powers to circumvent the protections offered to journalists and target otherwise legitimate newsgathering activities.

Absent from the extensive record that Cole has developed, and that the court has considered, are any statements made by any public official that express specific animus towards Cole or the article at issue here.[12] In this case, the United States has articulated a legitimate and tailored law enforcement need for Cole's testimony: his *Times* article was the first public disclosure

[12] Cole's declaration notes that he is preparing to publish a book that "details alleged self-dealing by the President's son-in-law, Jared Kushner, and the ways in which he may have used his influence with the President to gain access to bank accounts funded by foreign governments." Cole Mem. (ECF No. 2, at 20) (citing Cole Decl. ¶ 12 (ECF No. 2-3, at 3)). I do not find that this information serves as the basis of any form of harassment here because it does not relate to the scope of this subpoena and does not include comments made against Cole specifically by any government official. In fact, the Government notes it had no knowledge of this forthcoming publication until Cole filed his declaration in this matter, meaning it did not hold this information at the time the subpoena was issued. Gov't's Opp'n (ECF No. 8, at 18).

of "one of the most highly classified military missions in a generation" and he apparently received information on the mission through unauthorized disclosures of confidential information. Dave Philips & Matthew Cole, How A Top Secret SEAL Team 6 Mission Into North Korea Fell Apart, N.Y. TIMES (Sept. 5, 2025), https://www.nytimes.com/2025/09/05/us/navy-seal-north-korea-trump-2019.html [https:// perma.cc/AV3X-DNND]; Matthew Cole, NYT Article About the SEAL Team 6 Mission to North Korea, SUBSTACK (Sept. 5, 2025), https://matthewcole.substack.com/p/nyt-article-about-the-seal-team-6 [https://perma.cc/T3C9-TQWK]. The broader concerns he has documented regarding the administration's antagonism of the media are important and regrettable. They risk erosion of the trust which undergirds the court's relationship with federal prosecutors. But they are general and systemic worries, to which neither the Government's present investigation nor the prosecuting attorney of record in this case have contributed. Therefore, they do not demonstrate bad faith or harassment in the Government's decision to seek Cole's testimony.

**C. There is no federal common law reporter's privilege under Rule 501 that protects Cole from testifying before the grand jury.**

"At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." Branzburg, 408 U.S. at 687. The Fourth Circuit similarly declined to recognize

a qualified, federal common law reporter's privilege protecting confidential sources on the grounds that Branzburg declined to do so. United States v. Sterling, 724 F.3d 482, 499-505 (4th Cir. 2013). Cole argues that Federal Rule of Evidence 501, as interpreted by the Supreme Court in Jaffee v. Redmond, 518 U.S. 1 (1996), allows the court to recognize a common law reporter's privilege. Cole's Mem. (ECF No. 2, at 25-29). He notes that changed circumstances since Branzburg and Sterling—including the Government's heavy reliance on subpoenas for members of the news media and the lack DOJ self-restraint as a form of meaningful protection against a prosecutor's misuse of the grand jury process—now warrant the created of a qualified privilege for reporters and their confidential sources under Rule 501. Id. But even when analyzing the possibility of a reporter's privilege under Rule 501, the Fourth Circuit declined to recognize one because, unlike other common law privileges such as the attorney-client privilege and the psychotherapist-patient privilege, a reporter's privilege "does not seek to protect from public disclosure the 'confidential communications' made to him" but instead protects "published information conveyed to him by his source or sources." Sterling, 724 F.3d at 502. "His primary goal is to protect the identity of the person or persons who communicated with him because their communications violated federal, criminal laws." Id.

Cole relies on this court's holding in Matter of Search of Natanson, No. 1:26-sw-00054, 2026 WL 1458902, at *5 (E.D. Va. May 4, 2026), to argue there is a reporter's privilege that is not insubordinate in wholesale fashion to the Government's legitimate law enforcement needs. Cole's Mem. (ECF No. 2, at 28). But the court in Natanson explicitly distinguishes the search warrant in that case that would allow seizure of "irrelevant material that goes far beyond the states prosecutorial interest" from a "legitimate, good faith subpoena" that seeks testimony of facts relevant to a criminal prosecution. Matter of Search of Natanson, 2026 WL 1458902, at *6. That distinction is particularly relevant in the present matter because, as explained above, the grand jury subpoena here seeks information regarding the unauthorized disclosure of confidential national security information as it relates to one particular *Times* article, from one contributor to that article.

Ultimately, "[t]he Supreme Court has rejected a common law privilege for reporters" and "that rejection stands unless and until the Supreme court itself overrules [this] part of Branzburg." Sterling, 724 F.3d at 502 (quoting In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1155 (D.C. Cir. 2006)). Thus, I recommend the court decline Cole's invitation to find a common law reporter's privilege through Rule 501 of the Federal Rules of Evidence—already rejected by the Fourth Circuit.

**D. The subpoena does not intrude on First Amendment Associational rights.**

Cole briefly argues that compelled disclosure through the grand jury subpoena would infringe on associational rights guaranteed by the First Amendment. Cole's Mem. (ECF No. 2, at 23-25) (citing Hispanic Leadership Fund, Inc. v. Fed. Election Comm'n, 897 F. Supp. 2d 407, 420 (E.D. Va. 2012); Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 612-14 (2021)). However, the cases that Cole cites do not apply the associational rights doctrine to a reporter's "association" with sources—or even more specifically, sources that disclose classified information—but rather focus on association in terms of political group memberships. In this case, the United States is not seeking to prevent Cole from associating with his sources or from reporting on the information his sources provide to him. However, when those sources are believed in good faith to have unlawfully revealed classified national security information, [redacted]. Accordingly, the subpoena is not a violation of Cole's First Amendment associational rights and instead serves as a tool to obtain relevant and material information for the Government's investigation.

## III. RECOMMENDATION

For the foregoing reasons, this report recommends that the court DENY Cole's Motion to Quash Grand Jury Subpoena, (ECF No. 1).

## IV. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474

U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
July 31, 2026