**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **In re: Grand Jury Subpoena,**<br><br>**MATTHEW COLE,**<br><br>**Subpoenaed Party.** | Case No. 4:26DM1<br>4:25G1/NN25-2386 |

# PROPOSED BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS AMICUS CURIAE IN SUPPORT OF MATTHEW COLE'S MOTION TO QUASH AND OBJECTIONS TO REPORT AND RECOMMENDATION THAT COURT DENY MOTION TO QUASH

Jennifer A. Nelson
Va. Bar No. 94394
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
jnelson@rcfp.org

Bruce D. Brown
Lisa Zycherman
Gabe Rottman
Marietta Catsambas
Annie Seminara
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Local Rule 7.1 of the Eastern District of Virginia, amicus certifies as follows:

Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENTS ..... i

TABLE OF AUTHORITIES ..... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ..... 1

INTRODUCTION ..... 2

ARGUMENT ..... 5

I. Neither *Branzburg* nor *Sterling* supports a subpoena of this temporal or substantive scope. ..... 5

II. *Morison* rests on a premise that has not stood the test of time, and the Espionage Act, as applied to journalistic sources, is unconstitutionally vague and overbroad..... 10

CONCLUSION ..... 17

CERTIFICATE OF SERVICE ..... 19

## TABLE OF AUTHORITIES

**Cases**

*Ashcraft v. Conoco, Inc.*,
218 F.3d 282 (4th Cir. 2000) ........ 8

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........ 3, 5, 6

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 15

*Hoffman Ests. v. Flipside, Hoffman Ests.*,
455 U.S. 489 (1982) ........ 16

*In re Application of the United States for an Order Pursuant to 18 U.S.C. § 2703(d)*,
No. 26-4303, 2026 WL 3399358 (4th Cir., Nov. 10, 2026) ........ passim

*In re Grand Jury 87-3 Subpoena Duces Tecum*,
955 F.2d 229 (4th Cir. 1992) ........ 6, 7, 9

*In re Grand Jury Subpoena, Matthew Cole*,
No. 4:26-dm-00001 (E.D. Va. July 13, 2026) ........ 3

*In re Search of Real Property and Premises of Hannah Natanson*,
No. 1:26-sw-00054 (WBP), 2026 WL 510727 (E.D. Va. Feb. 24, 2026) ........ 7, 8

*Johnson v. United States*,
576 U.S. 591 (2015) ........ 15

*Kolender v. Lawson*,
461 U.S. 352 (1983) ........ 15, 16

*LaRouche v. Nat'l Broad. Co.*,
780 F.2d 1134 (4th Cir. 1986) ........ 6

*N.Y. Times Co. v United States*,
403 U.S. 713 (1971) ........ 3

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ........ 15

*United States v. Hale*,
No. 19-cr-00059 (CMH) (E.D. Va. Sept. 30, 2019) ........ 11

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ........ 4, 10, 11, 12

*United States v. Sterling*,
724 F.3d 482 (4th Cir. 2013) ........................................................................ 3, 5, 6

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978)......................................................................................... 7

**Statutes**

18 U.S.C. § 2703(d) ........................................................................................ 3, 9

18 U.S.C. § 793............................................................................................... 15

28 C.F.R. § 50.10 ............................................................................................. 3

42 U.S.C. §§ 2000aa ........................................................................................ 7

**Other Authorities**

16A C.J.S. Const. Law: First Amendment Rights ............................................ 16

*51st Anniversary of the Release of the Pentagon Papers*, Richard Nixon Presidential Library and Museum (June 6, 2022),
https://bit.ly/4kg6f2G....................................................................................... 12

Avril Haines, *Fighting for Balance*, *in* National Security, Leaks & Freedom of the Press (Lee C. Bollinger & Geoffrey R. Stone eds., 2021) ..................................................... 16

Ben A. Franklin, *Morison Receives 2-Year Jail Term*, N.Y. Times (Dec. 5, 1985),
https://bit.ly/4AvGujI....................................................................................... 14

Charlie Savage, *Power Wars: The Relentless Rise of Presidential Authority and Secrecy* (2015)
..................................................................................................................... 13

David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*,
127 Harv. L. Rev. 512 (2013)........................................................................... 16

Devlin Barrett & Charlie Savage, *Appeals Court Rebukes Justice Dept. Over Demand for Journalists' LinkedIn Data*, N.Y. Times (Nov. 10, 2026),
https://bit.ly/4AwJ7BK...................................................................................... 9

Elizabeth Goitein, *The Original Sin Is We Classify Too Much*, Brennan Ctr. for Just. (Jan. 26, 2023),
https://bit.ly/4zS5OR4 ..................................................................................... 17

*Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reps. Comm. for Freedom of the Press,
https://perma.cc/VVD8-TXG7........................................................... 2, 13, 14, 16

*Investigations: The Strange Case of Amerasia*, Time (June 12, 1950), https://perma.cc/QKW2-2CLE. .......... 12

Letter from Senator Daniel Patrick Moynihan to President William Jefferson Clinton (Sept. 29, 1998), available at https://perma.cc/2HYF-SD5G .......... 14

O. Holmes, The Common Law 1 (1881) .......... 17

*Reporters Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/XGM7-ET3H .......... 5

Sam Lebovic, *The Forgotten 1957 Trial that Explains Our Country's Bizarre Whistleblower Laws*, Politico (March 27, 2016), https://bit.ly/4jh14xl .......... 12

Valerie Strauss, *Navy Analyst Morison Receives a Pardon*, Wash. Post (Jan. 20, 2001), https://bit.ly/4zKyTO5 .......... 14

## IDENTITY AND INTEREST OF AMICUS CURIAE

Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today provides pro bono legal representation, amicus curiae support, and other resources to protect the legal rights of journalists. The Reporters Committee has a strong interest in ensuring that journalists can provide credible assurances of confidentiality to their sources, especially in the national security context, where claims of government secrecy are pervasive and the public's need for well-documented, fact-driven journalism is at its apex.

## INTRODUCTION

In the past year, the Justice Department has stepped up compulsory legal process against the press in investigations into the unauthorized disclosure of national defense information to the news media—colloquially known as "leaks." In January, for the first time in the nation's history, FBI agents conducted a raid of a reporter's home in a leak investigation, executing a search warrant and seizing every electronic device used by a Washington Post journalist in her work. In the ensuing months, the department sought to compel reporters at The Post, The Wall Street Journal, and, most recently, The New York Times, to disclose the identities of confidential sources before a grand jury. In each case, the government withdrew the subpoenas following court challenge. In the quarter century before 2026, the department sought such testimony in a mere three cases, involving just eight reporters.[1] Yet, in 2026 alone, it has issued testimonial subpoenas in at least four cases, involving 10 reporters, including Matthew Cole.

As Magistrate Judge Douglas Miller recognized in his Report and Recommendation, this significant uptick has come amidst "broader efforts of the current presidential administration to apply pressure on journalists and reporters critical of President Donald Trump," which Judge Miller deemed "distressing and lamentable." Redacted R. & R. at 21, ECF No. 25. And this uptick is doubly concerning given that leak probes necessarily involve government scrutiny of

[1] *See Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reps. Comm. for Freedom of the Press, https://perma.cc/VVD8-TXG7 (last updated Nov. 16, 2026) [hereinafter "*Federal Cases Involving Unauthorized Disclosures to the News Media*"]. Those three cases are the Valerie Plame investigation (where six reporters in total were subpoenaed), the multiple subpoenas to James Risen in the Jeffrey Sterling case, and the Michael Levine case. *See id.* at 67–70, 83–86. The Levine matter involved a suspected grand jury leak in a terrorism prosecution, not an Espionage Act investigation. That leaves Plame and Sterling as the only cases implicating the Espionage Act in the 25 years between the 9/11 attacks and the start of the second Trump administration in which journalists were served with testimonial subpoenas. This count starts in 2001 given that prior to the 9/11 attacks, Espionage Act leak prosecutions were vanishingly rare. *See infra* pp. 12–13.

reporting about secret government activity itself, which creates an incentive to try to suppress news that is in the public interest but merely inconvenient or embarrassing to the government. *See N.Y. Times Co. v United States*, 403 U.S. 713, 722 (1971) ("Secrecy in government . . . perpetuat[es] bureaucratic errors.") (Douglas, J., concurring).

Amicus agrees with Cole that the Court should conduct a searching analysis of the propriety of the subpoena with that broader context in mind and offers two additional arguments.

First, the subpoena here differs from those at issue in *Branzburg v. Hayes*, 408 U.S. 665 (1972), and *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013), in multiple, material ways. As counsel for Cole notes, the subpoena appears designed to build the government's case in the first instance, rather than confirming discrete facts about an identifiable suspect in an advanced investigation. *See* 28 C.F.R. § 50.10(c)(4)(i)(A) (requiring attorney general to find reasonable grounds to believe crime occurred and information is "essential" to "investigation or prosecution" prior to authorizing a subpoena). One irregularity stands out, especially considering Judge J. Harvie Wilkinson's opinion for a unanimous Fourth Circuit in *In re Application of the United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, No. 26-4303, 2026 WL 3399358 (4th Cir., Nov. 10, 2026) [hereinafter "*LinkedIn*"]. That irregularity is the subpoena's remarkable scope. The government here seeks testimony regarding "two years' worth of reporting, including the identities of at least two dozen sources along with the substance of their conversations." Redacted Mem. of Law in Further Support of Matthew Cole's Mot. to Quash at 16, *In re Grand Jury Subpoena, Matthew Cole*, No. 4:26-dm-00001 (E.D. Va. July 13, 2026) (ECF No. 24). But as Judge Wilkinson confirmed with respect to court orders under 18 U.S.C. § 2703(d) ("(d) orders"), the First Amendment establishes an "outer limit to the amount of irrelevant or immaterial records the government may obtain." *LinkedIn*, 2026 WL 3399358 at

*5–6 (finding statutory limits on (d) orders are "conjoined with, and bolstered by, the dictates of the First Amendment"). The same logic applies to a testimonial grand jury subpoena and counsels in favor of a finding that the Cole subpoena is overbroad.

Second, lurking under the surface of this subpoena is its troubling predication: the Espionage Act of 1917. To date, the only federal appellate case analyzing the Espionage Act's constitutionality under the First Amendment as applied to journalistic sources is the Fourth Circuit's opinion in *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988). The soundness of the holding in that case—ostensibly rejecting First Amendment challenges to the conviction of a naval intelligence analyst for leaking to the press—cannot be assessed without reference to its two concurrences, including one by Judge Wilkinson and a special concurrence by Judge James Phillips. Both concurrences rested upon an assumption that upholding the defendant's conviction in *Morison* would not set a precedent that would convert the Espionage Act into a "simple Government Secrets Act which Congress has refused to enact." *Id.* at 1086 (Phillips, J., concurring specially). That assumption has not been borne out by Espionage Act leak prosecutions since *Morison*, which have only grown in number to the point that they are now routine. And, as that history strongly suggests, the Espionage Act, as applied to journalistic sources, should fail First Amendment scrutiny under both vagueness and overbreadth doctrine. Those constitutional deficiencies likewise support close scrutiny of the instant subpoena.

For the reasons given herein, amicus urges this Court to reject the Magistrate Judge's Report and Recommendation and grant Cole's Motion to Quash.

## ARGUMENT

### I. Neither *Branzburg* nor *Sterling* supports a subpoena of this temporal or substantive scope.

As noted, the subpoena directed at Cole sweeps widely. It seeks testimony regarding two years of reporting and the identities of two dozen confidential sources, along with details regarding substantive discussions.

The government opposes the motion to quash based on *Branzburg* and *Sterling*. It points to the Supreme Court's assertion that there is "no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation." Gov't's Redacted Resp. Mot. to Quash, at 6, ECF No. 23 (quoting *Branzburg*, 408 U.S. at 708). And it cites to *Sterling*, which, in reliance on *Branzburg*, held that a trial subpoena served on reporter James Risen had been issued in good faith, *Sterling*, 724 F.3d at 498; that Risen was not being "called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation," *id.* at 498–99 (quoting *Branzburg*, 408 U.S. at 710 (Powell, J., concurring)); that there was no "reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement," *id.* at 499 (quoting *Branzburg*, 408 U.S. at 710 (Powell, J., concurring)); and that there were no indications that the government was attempting to "annex" Risen as its "investigative arm," *id.* (quoting *Branzburg*, 408 U.S. at 709 (Powell, J., concurring)).

Importantly, *Sterling* did not hold that there was *no* First Amendment privilege, nor did the Fourth Circuit reject the case-by-case balancing approach urged by Justice Powell in his *Branzburg* concurrence, which other jurisdictions have relied on to recognize a qualified privilege in the grand jury context. *Id.* at 495–96; *Reporters Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/XGM7-ET3H (collecting cases). Indeed, the

court explicitly articulated the metes and bounds of any privilege in the terms laid out by Justice Powell, and it went to the trouble of analyzing whether, were it to apply the three-part privilege test in civil matters in the Fourth Circuit, the privilege would be overcome with respect to Risen. *Sterling*, 724 F.3d at 505–10 (applying, *arguendo*, three-part test requiring relevance, exhaustion, and compelling need under *LaRouche v. Nat'l Broad. Co.*, 780 F.2d 1134 (4th Cir. 1986), and finding it met); *see also In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 232 (4th Cir. 1992) ("We find that Justice Powell's opinion is the clearest explanation of how *Branzburg* applies to our facts.").

Both *Branzburg* and *Sterling* require, as a First Amendment matter, that a criminal subpoena (grand jury or trial) must serve a "legitimate need of law enforcement" *independent* of any bad faith, harassment, or other improper purpose inquiry. *Branzburg*, 408 U.S. at 709–10 (Powell, J., concurring) (identifying factors to be considered in balancing "constitutional and societal interests" case-by-case, including: (1) evidence of harassment and bad faith, (2) demand for "remote and tenuous" information, or (3) "some other reason to believe that [the] testimony implicates confidential source relationship(s) without a legitimate need of law enforcement").

As part of this calculus, *Sterling* emphasized repeatedly that Risen had been called to testify at trial about his personal knowledge of criminal activity by one identifiable suspect, the accused. 724 F.3d at 492. The Fourth Circuit analogized Risen to the reporters in *Branzburg*, one of whom had reported on direct, eyewitness observations of individuals synthesizing hashish (replete with publishing faceless pictures of the hands of the producers doing the synthesizing) and two of whom had personally observed suspected criminal activity by the Black Panther Party. *Id.* Implicit in this "legitimate need" analysis is that there be a strong indication that the sources who would be identified through the reporter's compelled testimony are themselves the

ones who committed the crime. And that requires careful tailoring of the scope of the subpoena as a matter of First Amendment law. *See In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d at 234 ("[D]istrict courts [must] apply with special sensitivity, where values of expression are potentially implicated, the traditional rule" barring "arbitrary fishing expeditions" and selection of targets "out of malice or an intent to harass"). In other words, under any formulation of the relevant inquiry, the "legitimate need" analysis would prohibit, for instance, process that demands a journalist identify dozens of confidential sources who are not suspects.

Recent caselaw in this Court and the Fourth Circuit arising out of the administration's wider efforts to intrude on reporter-source relationships confirms this reading. In the FBI raid of Washington Post reporter Hannah Natanson, Natanson filed a motion under Federal Rule of Criminal Procedure 41(g) for return of her seized electronic devices or, in the alternative, in camera review of the seized data to identify responsive materials. *See In re Search of Real Property and Premises of Hannah Natanson*, No. 1:26-sw-00054 (WBP), 2026 WL 510727 (E.D. Va. Feb. 24, 2026). In granting the request for in camera review, Magistrate Judge William Porter found that an overbroad search warrant—one that authorized the seizure of a vast amount of journalistic work product covered under the federal Privacy Protection Act, 42 U.S.C. §§ 2000aa, 2000aa-5 to 2000aa-7, alongside a miniscule amount of suspected evidence of an Espionage Act violation—constituted a "restraint on the exercise of First Amendment rights." *In re Search of Real Property and Premises of Hannah Natanson*, 2026 WL 510727 at *9. That overbroad reach, Judge Porter held, required the Court to weigh with "scrupulous exactitude" the "Movants' First Amendment rights and newsgathering rights against the government's compelling interest in its prosecution." *Id.* at *8–9 (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)). And in undertaking that strict balancing, Judge Porter found "it reasonable for

the government to retain only the limited information responsive to the search warrant—and nothing more." *Id.* at *9.

The government filed objections to Judge Porter's order with District Judge Anthony Trenga, who explicitly relied on the "legitimate need of law enforcement" factor in *Sterling* in affirming the magistrate ruling. *In re Search of Real Property and Premises of Hannah Natanson*, 2026 WL 1458902 at *6. Judge Trenga distinguished *Sterling*, noting that the testimony sought there went to the "heart of the prosecution" and did not "implicate source relationships without a legitimate need of law enforcement." *Id.* (citation omitted). "Here, Natanson, as a reporter," Judge Trenga wrote, "is not resisting testifying or providing relevant information, but rather is resisting the Government's review of irrelevant material that goes far beyond the stated prosecutorial interest of investigating" the alleged leaker. *Id.* Judge Trenga went so far as to suggest that the seizure of a "large volume of non-responsive documents" can be, *in and of itself*, evidence of an improper purpose. *See id.* ("Nor can the Court ignore, *whether intended or not*, the harassing and chilling effects such a seizure could have on a reporter, particularly one focused on Executive Branch conduct and where the Government contends that *all of the Seized Material is presumptively relevant* to the investigation at this point.") (emphasis added, internal citations omitted). While the Natanson case involved a different form of process—a search warrant—the above discussion demonstrates that there is no principled reason to distinguish between a search warrant and a grand jury subpoena, as evidenced by Judge Trenga applying privilege analysis to the seizure. *Id.* at *5 (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000)).

Judge Wilkinson applied a notably similar approach in last week's *LinkedIn* opinion writing for a unanimous panel. 2026 WL 3399358 at *1. Like *Natanson* and the instant

subpoena, the (d) order sought in that case would "seemingly identify a vast number of confidential sources who have no conceivable relationship to the matter under investigation." *Id.* The (d) order compelled the production of LinkedIn metadata for an 18-month period for multiple journalists "affiliated" with an article "purporting to describe a top-secret United States military operation in a foreign country." *Id.* (internal citation omitted). There are indications that the *LinkedIn* (d) order may have been issued in the underlying investigation here. Devlin Barrett & Charlie Savage, *Appeals Court Rebukes Justice Dept. Over Demand for Journalists' LinkedIn Data*, N.Y. Times (Nov. 10, 2026), https://bit.ly/4AwJ7BK.

While, again, the *LinkedIn* case involved a different form of process than a grand jury subpoena—one that requires "specific and articulable facts showing that there are reasonable grounds to believe" that the metadata sought is "relevant and material to an ongoing criminal investigation," 2026 WL 3399358 at *5 (citing 18 U.S.C. § 2703(d))—the operative language in both the grand jury context and the (d) order context is "relevant and material." Indeed, Judge Wilkinson relied on a grand jury subpoena case in finding that, with (d) orders, the statutory text and the First Amendment inquiry into overbreadth are "joined at the hip" and that a district court must therefore apply "special sensitivity" to ensure that any order only seek "relevant and material" records. *See id.* at *8 (citing *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d at 234).

The *LinkedIn* panel also adopted the reasoning of Justice Powell's concurrence in *Branzburg*—confirming its applicability as the proper articulation of the privilege in the Fourth Circuit—to require the district court in that case to conduct a "balancing analysis." *Id.* As relevant here, that analysis must consider the "constitutional burden" that a (d) order—which, like a grand jury subpoena, will sweep in "some degree of irrelevant material"—places on

"fundamental constitutional freedoms," including newsgathering. *Id.* Accordingly, the appeals court remanded the case to the district court, directing it to consider four factors: "(1) the government's need for the Disclosure Order, (2) the breadth of the records sought and whether any subdivision might feasibly be drawn, (3) that the government cannot know precisely what is relevant at early stages of the investigation, and (4) any First Amendment and [Stored Communications Act] standards implicated by the Disclosure Order." *Id.*

While the Fourth Circuit recognized that there may be *some* imprecision in an investigative demand at the outset of an investigation, it nonetheless clearly held that "substantial over[breadth]" is anathema under the First Amendment. *Id.* at *7–8 ("A request by the government to scoop up reporters' records wholesale and ascertain the identity of their sources would tip the balance against informed discourse in a manner inimical to democratic health."). The court also confirmed that the inquiry is not just statutory, but constitutional, and that the First Amendment clearly protects the ability of journalists to credibly assure sources that their identities will remain confidential. *Id.* at *7 ("Confidentiality of sources is the lifeblood of a free press."). As applied to the scope of the instant subpoena, there should be no question that its sweep presents substantial overbreadth and, as such, a threat to "democratic health." *Id.* at *7–8. As Judge Wilkinson put it, "prosecutions freed from partisanship and retribution, a fearless and independent judicial system, and a secure and accessible electoral process all serve to supplement press freedom in distinguishing liberty from oppression." *Id.* at *7.

## II. ***Morison*** rests on a premise that has not stood the test of time, and the Espionage Act, as applied to journalistic sources, is unconstitutionally vague and overbroad.

Prior to the 9/11 attacks, Espionage Act prosecutions of government employees or contractors for disclosing national defense information to the press were almost unheard of. Only one federal appellate court—the Fourth Circuit—has had occasion to consider the

constitutionality of the Espionage Act as applied to journalistic sources. *Morison*, 844 F.2d 1057. And while the government cites that case as cleanly holding that deploying the Espionage Act against journalistic sources raises no First Amendment concern, *see, e.g.*, Gov't's Opp. to Def's Mot. to Dismiss Indictment, *United States v. Hale*, No. 19-cr-00059 (CMH) at 6, 16 (E.D. Va. Sept. 30, 2019), ECF No. 73, the opinion is far more nuanced. Judges Wilkinson and Phillips, in declining to find the Espionage Act unconstitutionally vague or overbroad as applied to Morison, nonetheless drafted concurring opinions, in Judge Phillips's case a special concurrence, that rejected the majority opinion's suggestion that "we do not perceive any First Amendment rights to be implicated here." *Morison*, 844 F.2d at 1068.

Judge Wilkinson wrote that "investigative reporting is a critical component of the First Amendment's goal of accountability in government" and to "stifle it might leave the public interest prey to the manifold abuses of unexamined power." *Id.* at 1084. But, he explained, "It is far from clear . . . that an affirmance here would ever lead to that result. . . . Even if juries could ever be found that would convict those who truly expose governmental waste and misconduct, the political firestorm that would follow prosecution of one who exposed an administration's own ineptitude would make such prosecutions a rare and unrealistic prospect." *Id.* Judge Phillips went further. He credited the "real and substantial" First Amendment issues in the case, noting that the Espionage Act statutes are "unwieldy and imprecise instruments for prosecuting government 'leakers' to the press as opposed to government 'moles' in the service of other countries," and observing that limiting jury instructions are "a slender reed upon which to rely for constitutional application of these critical statutes." *Id.* at 1085–86. Yet he ultimately adopted Judge Wilkinson's reasoning and concluded that "the practical dynamics of the developed relationship between press and government officials [means] that this use of the

[Espionage Act] will not significantly inhibit needed investigative reporting about the workings of government in matters of national defense and security." *Id.* at 1086. That, Judge Phillips found, was the "critical judicial determination forced by the first amendment arguments advanced in this case." *Id.*

Judge Wilkinson and Judge Phillips's optimistic predictions have not come to pass. The Espionage Act, as deployed today and as illustrated by this case, threatens to suppress investigative reporting on matters of public concern about government affairs. While *Morison* represents the sole successful prosecution of a journalistic source under the Espionage Act for leaking government secrets to the press prior to this century, the last two-and-a-half decades have shown that the prosecution of journalistic sources is now neither rare nor unrealistic.

Before the 9/11 attacks, the Justice Department had initiated cases under the Espionage Act against individuals suspected of leaking to the press in only four cases. Shortly after World War II, agents arrested employees of a magazine called Amerasia and their alleged sources regarding violations of the Espionage Act involving leaks from the Office of Strategic Services, the precursor to the CIA. *Investigations: The Strange Case of Amerasia*, Time (June 12, 1950), https://perma.cc/QKW2-2CLE. Prosecutors resolved that case with plea deals under lesser charges. In the 1950s, the government sought to prosecute John Nickerson, an Army officer, under the Espionage Act for press leaks regarding a Cold War missile program, again only to have the case end with a plea agreement under different charges. Sam Lebovic, *The Forgotten 1957 Trial that Explains Our Country's Bizarre Whistleblower Laws*, Politico (March 27, 2016), https://bit.ly/4jh14xl. In the 1970s, prosecutors brought charges against the Pentagon Papers leakers, Daniel Ellsberg and Anthony Russo, but their case collapsed due to government misconduct. *51st Anniversary of the Release of the Pentagon Papers*, Richard Nixon

Presidential Library and Museum (June 6, 2022), https://bit.ly/4kg6f2G. And, in the 1980s, the Justice Department brought the successful Morison case.

Contrast that with the period between 2001 and the present, in which investigations of leaks to the press, and accompanying legal process against journalists, have become normalized. *See generally Federal Cases Involving Unauthorized Disclosures to the News Media*. The George W. Bush administration was the first to treat such disclosures as counterintelligence matters, akin to traditional nation-state espionage. Charlie Savage, *Power Wars: The Relentless Rise of Presidential Authority and Secrecy* 351–53 (2015). In addition to its pursuit of the Plame case, which started in part as an Espionage Act investigation, it indicted a Pentagon analyst and two employees of the American Israel Public Affairs Committee in 2005 for sharing state secrets (though neither AIPAC official was a government employee) and initiated the Sterling investigation, which led to a grand jury subpoena to James Risen in 2008. The Obama administration picked up the mantle, starting with the prosecution of Shamai Leibowitz in 2009. It issued a grand jury subpoena to Risen in 2010 and a trial subpoena to him in 2011 and the numbers grew rapidly from there. Since 2001, there have been 23 Espionage Act prosecutions of journalistic sources in total.[2] This counts the AIPAC case under President Bush, where there were allegations that the analyst and the AIPAC employees had disclosed information to the press, but does not count Plame, which ultimately did not lead to charges under the Espionage Act or other espionage laws. The Obama administration brought 10 of these cases plus Hitselberger. *See Federal Cases Involving Unauthorized Disclosures to the News Media* at 74–

[2] The Obama administration also prosecuted James Hitselberger, a Navy contract linguist, for sending classified material to a public archive at a think tank. *See, e.g.*, *Federal Cases Involving Unauthorized Disclosures to the News Media* at 90–92.

97. The first Trump administration brought seven. *Id.* at 98–128. The second Trump administration has publicly brought five so far. *Id.* at 129–31.

Not only are there vastly more Espionage Act prosecutions today, but the sentences for those convicted continues to increase in severity. At the time of his sentencing in 1985, for example, Morison was the only government official "convicted of an activity which has become a routine aspect of government life: leaking information to the press in order to bring pressure to bear on a policy question." Letter from Senator Daniel Patrick Moynihan to President William Jefferson Clinton (Sept. 29, 1998), available at https://perma.cc/2HYF-SD5G. He was sentenced to two years in prison. Years later, in 2001, President Bill Clinton granted him a pardon. *See id.*; Ben A. Franklin, *Morison Receives 2-Year Jail Term*, N.Y. Times (Dec. 5, 1985), https://bit.ly/4AvGujI; Valerie Strauss, *Navy Analyst Morison Receives a Pardon*, Wash. Post (Jan. 20, 2001), https://bit.ly/4zKyTO5.

Modern sentences have only grown more punitive relative to this historical precedent. Leibowitz, who received a 20-month sentence in 2010, and Thomas Drake, who pled guilty in 2011 to a misdemeanor count of exceeding access to government computers and received probation, faced relatively light sentences. *Federal Cases Involving Unauthorized Disclosures to the News Media* at 74–78. But sentences increased over the course of the Obama administration, with Sterling, for instance, receiving 42 months in prison. *Id.* at 83–85. And punishments then spiked during the first Trump administration with Reality Winner and Terry Albury receiving the longest and second longest sentences, respectively, to that point. *Id.* at 98–100.

The significant increase in prosecutions of journalistic sources is directly relevant to the question of whether the Espionage Act is unconstitutionally vague. "[T]he void-for-vagueness

doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Sections 793(d) and (e) of the Espionage Act criminalize "willfully communicat[ing] . . . or caus[ing] to be communicated" any tangible material "relating to the national defense" to "any person not entitled to receive it," regardless of subjective intent to injure national security or actual injury suffered by the United States. 18 U.S.C. §§ 793(d)–(e). It is also a crime under those subsections to willfully communicate "information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation." *Id.*

The Department of Justice's discretion to determine whether speech "relating to the national defense" should be subject to criminal sanctions is therefore vast and susceptible to arbitrary and selective enforcement. Of acute concern is the fact that the government could deploy the statute to suppress news on topics it wishes to sweep under the rug, depriving the public of information crucial to government accountability. This concern is one of the primary harms of vagueness that the doctrine exists to combat. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."); *see also Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring) ("Vague laws invite arbitrary power."); *Johnson v. United States*, 576 U.S. 591, 597 (2015) ("[T]he indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges.").

The potential severity of the punishment is likewise relevant to the vagueness analysis. *See Dimaya*, 584 U.S. at 184–85 (Gorsuch, J., concurring) ("Given [the severity of civil penalties today], any suggestion that criminal cases warrant a heightened standard of review does more to persuade me that the criminal standard should be set *above* our precedent's current threshold than to suggest the civil standard should be buried *below* it." (emphasis in original)); *Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 498 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."). As noted, sentences of journalistic sources have been climbing in recent years, from two years in prison in the *Morison* case to 33 years in the case of Joshua Schulte. *Federal Cases Involving Unauthorized Disclosures to the News Media* at 100–02.

The vagueness inherent in the Espionage Act strengthens arguments that it is also overbroad "since statutes are often overly broad because their language is vague as to what behavior is proscribed." 16A C.J.S. Const. Law: First Amendment Rights § 10; *see also Kolender*, 461 U.S. at 358 n.8 ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines[.]"). The Espionage Act's lack of clarity as to which leaks will draw the government's ire grants prosecutors undue discretion to pursue cases even those predicated on information that should not, in the first instance, be secret, all of which supports a finding of unconstitutional overbreadth.

Indeed, that is a certainty given the universally recognized problem of overclassification of government information. For years, there has been consensus among both national security officials and transparency advocates that "too much information that should not be classified is classified." Avril Haines, *Fighting for Balance*, *in* National Security, Leaks & Freedom of the

Press 25 (Lee C. Bollinger & Geoffrey R. Stone eds., 2021); *see also* David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512, 623 (2013) (describing "classification levels" as "gargantuan"); Elizabeth Goitein, *The Original Sin Is We Classify Too Much*, Brennan Ctr. for Just. (Jan. 26, 2023), https://bit.ly/4zS5OR4 ("Insiders have estimated that anywhere between 50 and 90 percent of classified documents could safely be made public."). Overclassification thus virtually guarantees Espionage Act overbreadth.

The proliferation of criminal press leak prosecutions, the increased severity of related punishments, and the ongoing problem of overclassification indicate that both the overbreadth and void-for-vagueness analyses in *Morison* do not hold up forty years later, proving in yet another context the insight of Holmes' famous aphorism that "the life of the law" is not "logic" but our "experience" in living with legal rules and norms across the passage of time. *See* O. Holmes, The Common Law 1 (1881). The history of the Espionage Act post-*Morison* has surfaced serious constitutional infirmities with the statute, and courts scrutinizing subpoenas authorized by the law, like the one to Cole, must look closely at demands made of journalists to ensure that they do not violate the First Amendment.

## CONCLUSION

For the reasons given herein, amicus respectfully urges the Court to reject the Magistrate Judge's Report and Recommendation and grant Mr. Cole's Motion to Quash.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Jennifer A. Nelson*
Jennifer A. Nelson
Va. Bar No. 94394
REPORTERS COMMITTEE FOR

FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
jnelson@rcfp.org

Bruce D. Brown
Lisa Zycherman
Gabe Rottman
Marietta Catsambas
Annie Seminara
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I, Jennifer A. Nelson, hereby certify that on November 17, 2026, I filed the foregoing memorandum of law using the Court's CM/ECF system, which effected service on all parties.

Respectfully submitted,

*/s/ Jennifer A. Nelson*
Jennifer A. Nelson
*Counsel for Amicus Curiae*